## Parmentier *versus* Wheat *et al.*

If the consideration of a contract for the sale of land be entire and indivisible, although payable partly in cash and partly in labour to be performed for the vendor, the vendee is not entitled to a conveyance, until full compliance with the terms of the agreement.

The payment of the money part of the consideration, does not affect the vendor's right to retain the legal title, as security for the performance of the other covenants in the agreement.

ERROR to the Common Pleas of *Tioga county*.

This was a judgment entered by virtue of a bond and warrant of attorney, dated the 19th December 1853, in favour of Sylvia Parmentier against G. C. Wheat, Warren Wells, and Griffin Beckwith, conditioned for the payment of $3295.97, as follows : $1100 on the 19th December 1854; $1100 on the 19th December 1855; and $1095.97 on the 19th December 1856.

This bond and warrant of attorney were given in pursuance of the following contract between the parties, of the same date :—

"An agreement made this nineteenth day of December, A. D. one thousand eight hundred and fifty-three, between Sylvia Parmentier, of Brooklyn, New York, by her attorney in fact, Edward Bayer, of the first part, and C. G. Wheat, Warren Wells, and Griffin Beckwith, of Jackson, in the county of Tioga, Pennsylvania, of the second part, witnesseth : That the said first party, for and in consideration of the *payments, covenants, and agreements* hereinafter mentioned, *to be made and performed by the said second parties,* is to sell and convey by a good and sufficient deed of general warranty, to the said second parties, all that certain lot or piece of land (with the rights and appurtenances), lying and situate in the township of Tioga, and state of Pennsylvania, and bounded as follows, to wit : Beginning at the first green hemlock tree on the west side of Crooked Creek, about thirty rods below the old upper saw-mill on the first party's premises ; thence up along said creek, by its several courses (including said mill and the privileges thereof), to the place where the said creek bends its course towards the Mansfield farm-house ; thence across said creek to a small elm-tree on the opposite bank ; thence south seventy-eight degrees west, seven rods, to a large elm-tree on the south bank of the cove ; thence across said cove south eighty degrees west, sixty-three rods, to a stake in the line of land belonging to the estate of George Daggett, deceased ; thence northerly along the said line to the place it intersects said Crooked Creek ; thence down said creek according to its course, to a large buttonwood-tree, standing opposite to the first roll-way, above the said Mansfield farm-house ; thence north eighty-seven and one-half degrees

east, to the place of beginning; supposed to contain about eighty acres, more or less, and being the same land contracted to Seth Daggett, and by an arrangement with him now hereby contracted to said second parties, by their giving a judgment-bond to secure the payment of the purchase-money for the same with interest, as hereinafter mentioned.

" In consideration of which, the said second parties are to pay to the said first party, the full sum of three thousand two hundred and ninety-five dollars and ninety-seven cents, with interest on the whole sum unpaid at the time of each payment, as follows, to wit: They are to cut of such lengths as directed by the said first party or her agent, from time to time, convey to the Gang saw-mill on said premises, without splitting or injury, and there manufacture and stick up, in a good and workmanlike manner, at least five hundred thousand feet of merchantable lumber, from the timber on that part of the Mead warrant, belonging to said first party, lying east of said Crooked Creek, each and every year, until the whole of the white and Norway pine timber on said land, suitable for market lumber, is manufactured and stuck up at said mill; including all up to the Willard slide on the south-west, and all on the top of the hill as far south-east as the place Philo Olmstead left off cutting, supposed to amount in all to *two and one-half or three millions of feet.* And the said second parties are to take all of the said timber clean, as far as they go, from time to time, on said land, and manufacture from the same, and all the timber taken from said land, as much market gang lumber of the kinds designated by the said first party or her agent, from time to time, as practicable, by using all necessary skill and diligence to make such from all pieces that may be rendered marketable by edging or otherwise; and for cutting, getting in, and manufacturing as aforesaid, and sticking up in a suitable place at said mill and delivering to said first party, the second parties are to have the sum of five dollars per thousand feet for all the merchantable lumber they make from the timber on said land, except the sample and mill culls, which are to belong to said second parties; two dollars and fifty cents of which is to be endorsed on this contract to apply on purchase-money from time to time, as the quantity of lumber manufactured, piled, and delivered to said first party is ascertained by estimate or measurement by the parties or competent persons employed by them for that purpose, until the whole of the said purchase-money and interest as aforesaid is fully paid; and the balance, two dollars and fifty cents, in cash; provided the said first party is to retain from the price of the first five hundred thousand feet the amount of a certain note and interest, given by the second parties to the first party, for mill gearing, &c., sold to them, and after the payment of the said note and interest as aforesaid, the said five dollars per thousand feet is to be paid to the said second

parties from time to time, as aforesaid, in cash. Provided, there shall be no estimate, measurement, endorsement, or payment at any time until after at least one hundred thousand feet of the said lumber is ready to be delivered, which has not been before estimated or measured. And it is further agreed, that the said first party is to keep in good repair the bridge built by her, near the residence of William Patrick; and the said second parties are to have the use of the same.

" And the said second parties are to build as good a bridge across the said creek opposite the dwelling of Seth Daggett, and keep said bridge in good repair; and make and keep in good repair the road between the said bridges; and the said first party is to have the free use of said second parties' bridge, and the road between the said bridges, and the road beyond the said second parties' bridge, leading to her land east of Crooked Creek; and she is to make and keep in good repair the road from her said bridge to the plank-road, and the said second parties are have the free use of the same.

" The said second parties are to give their judgment-bond to secure the payment of the said purchase-money, with interest, to the said first party; *and as soon as practicable, after the said timber on said land is all manufactured, stuck up and delivered to her as aforesaid, she is to execute and deliver to the said second parties said warranty deed for said premises, and not before.*

" The mill culls are to be thrown out and not piled with the other lumber, and the sample cull lumber is to be selected at the times the said lumber is estimated or measured, and delivered to said first party, and the said second parties are not to have any but what is strictly sample cull lumber, and any that the said first party is willing to pay for manufacturing, &c., at the price aforesaid, shall not be considered such. And it is understood that the amount of the said note and interest given for mill gearing, &c., is to be deducted from the amount of the cash payments on the first five hundred thousand feet of lumber manufactured by said second parties, as aforesaid.

" In witness whereof the said parties have hereunto set their hands and seals, the day and year first above written.

" S. PARMENTIER,    [L. S.]<br>
" By her attorney in fact, EDWARD BAYER,    [L. S.]<br>
" C. G. WHEAT,    [L. S.]<br>
" WARREN WELLS,    [L. S.]<br>
" GRIFFIN BECKWITH."    [L. S.]

The defendants, and the parties to whom they had assigned their interest in this contract, proceeded to manufacture lumber for the plaintiff, as provided in the agreement, and continued to do so at intervals, until December 1856, at which time, after giving

[Parmentier v. Wheat et al.]

them the credits provided for in the contract, there was a balance of $1012 due on the bond.

On the 21st March 1857, the plaintiff issued a *fi. fa.* for this balance, which was levied on personal property; and on application of the defendants, a rule was granted to show cause why the judgment should not be opened and the defendants let into a defence. Whilst this rule was pending the defendants got in and manufactured about 30,000 feet of lumber previously cut, and on the 4th August 1857, the court directed an issue to ascertain the amount due to the plaintiff on the judgment; proceedings to be stayed as to $539.25, with liberty to go on and collect the residue, which was done.

The issue was tried on the 18th December 1857, and resulted in a verdict for the plaintiff for $514.09, for which the plaintiff issued execution; and on the 11th December 1858, the court made an order that the fund which had been paid into court by the sheriff, should remain impounded, until the plaintiff should execute a deed for the land mentioned in the contract, to William B. Keys, Benjamin Wells, Seth Daggett, and Lewis Daggett, the defendant's assignees; to be deposited with the prothonotary and delivered to the said assignees, if the final determination of the rule should be in their favour.

The plaintiff, thereupon, removed the proceedings to this court, and here assigned such order for error.

*Seymour*, for the plaintiff in error, cited Levering v. Phillips, 7 *Barr* 390 ; Carmalt v. Platt, 7 *Watts* 318; *Chitty on Contracts* 737–8 ; *Addison on Contracts* 864–5; Reybold v. Voorhees, 6 *Casey* 116 ; Morrow v. Waltz, 6 *Harris* 118 ; Williams v. Bently, 3 *Casey* 294; *Chitty on Contracts* 74, n.; Ludwig v. Leonard, 9 *W. & S.* 47 ; McFarson's Appeal, 1 *Jones* 511 ; Nelson v. Von Bonnhorst, 5 *Casey* 352.

*Guernsey & Williams*, for the defendants in error, cited Mathers v. Akewright, 2 *Binn.* 93; Adams v. Williams, 2 *W. & S.* 227; Love v. Jones, 4 *Watts* 465.

The opinion of the court was delivered by

THOMPSON, J.—The errors assigned relate to the order made in the court below, directing the money made on the *venditioni* against the defendants, to be paid into court, and there to remain until a deed for certain premises, of which it was part consideration, should be made by the plaintiff to the defendants.

The propriety of the order depends entirely on the nature of the contract between the parties, and its fulfilment, for it may be conceded that this power may be exercised in a proper case. The contract out of which the dispute arises, is dated 19th of Decem-

[Parmentier *v.* Wheat *et al.*]

ber 1853. The real parties in the case are those claiming title through sundry transfers, under the original vendees of the land, parties to the contract and defendants on the record. These original defendants parted with their interest in the land in 1855, and it became subsequently vested in William B. Keys, Benjamin Wells, Seth and Lewis Daggett, the present claimants of the land and mills, the subject of the contract.

The question to be determined, in arriving at a satisfactory conclusion in regard to the order, is, whether the contract for the sale and purchase of the land was entire or not, and whether it was so far completed as to entitle the defendants to this equitable interposition of the court. It may be stated here, that if the contract is entire, that is to say, if the consideration stated in the contract is indivisible, there was not a compliance, for payment was made a condition precedent to the execution and delivery of the deed; and it was not pretended that all the covenants in the article had been complied with by the defendants. On the argument here, it struck my mind, that the consideration for the land was the sum of money mentioned as the purchase-money, and that the other covenants were collateral and independent of that. This momentary misapprehension arose out of the peculiarity of the terms used in the instrument, rather than the force and effect of it.

On an examination of the article, it very plainly appears that the consideration was not only the sum of money mentioned, but a covenant to manufacture into boards for the plaintiff, all the timber fit for the purpose, on a tract of land belonging to her, adjoining the land sold and described in the article, the estimated amount of which was from two and a half to three millions of feet, at $5 per thousand. The defendants gave their judgment-bond to the plaintiff for $3295.97, which, with literal accuracy, was called the purchase-money, for the reason that it was the only money consideration mentioned, payable in three annual instalments from its date, and on it judgment was entered shortly before it all fell due. This bond, by the articles of agreement, was to be paid up by the manufacture of lumber from the land mentioned. As fast as the vendees manufactured according to the agreement, they were to receive a credit of $2.50 per thousand on the contract, in satisfaction of the bond, and a like sum in cash from the plaintiff. After the bond by this means should be paid up, then the plaintiff was to pay for the manufacturing of the residue of the timber, five dollars per thousand, cash. It is evident that the plaintiff sold the land to the defendants in consideration of manufacturing into boards the timber on the adjoining tract: and that this was a most important part of the consideration, is apparent from the proof, that the manufactured lumber at the mill was worth from $7 to $9 per thousand, and that the estimated amount

[Parmentier v. Wheat *et al.*]

of from two and a half to three millions of feet was the amount on which she could realize, without further expense, from two to four dollars per thousand clear, as the value of her timber. This of itself shows that the money was not the full consideration, and that the collection of it did not satisfy the defendants' covenant.

The contract plainly shows that it was not in the contemplation of the parties, that the money mentioned as the purchase-money, was the consideration, for it starts out by setting forth, "that in consideration of the payments, covenants, and agreements hereinafter mentioned to be made, and performed by the said second party, the first party is to sell and convey," &c. Then follows a description of the premises sold, as also a description of the land from which the lumber was to be manufactured. Following this are the covenants of the defendants, agreeing to pay the judgment by sawing, and to manufacture into lumber all the timber on the land described at five dollars per thousand, estimating it at from two and a half to three millions of feet. Which is followed by the covenant of the vendor, that "as soon as practicable *after the said timber on said land* is all manufactured, stuck up, and delivered to her as aforesaid, she is to execute and deliver to the said second parties said warranty deed for said premises, *and not before.*"

There is no room for doubt but that the consideration was entire, and required a compliance in full before a deed could be demanded. The case of Carmalt v. Platt, 7 *W. & S.* 318, resembles this case much in the character of the covenants, and it was held there, as we do here, that the covenants were dependent and the consideration entire.

A chancellor could not decree a conveyance short of performance by the vendees, or something equivalent to it. To do so in this case would be to reform the contract, without any reason for it but non-compliance, and to expunge that portion of it which binds the vendor to convey only after full performance by the vendees. And this is simply the effect of the order made for the conveyance by the court below. If the plaintiff was to comply and make the conveyance, it would merge the article, for it would certainly be an acknowledgment of the receipt of the consideration mentioned in it. But even if it were possible to hold otherwise, the vendor, by making a conveyance, would lose the only security in her possession for performance, beyond the amount of the bond, which was all paid but about $500, to enforce the other covenants of the vendees, namely, her right to enforce them by virtue of the legal title. In this event she would be turned to her action of covenant against the vendees, not now in possession, and perhaps not in the country, and still perhaps, worth nothing if they were. There would be no equity in such results.

[Parmentier *v.* Wheat *et al.*]

The defence of the ruling of the learned judge rests upon the argument that as the sum of $3295.97 is called the purchase-money, and as that sum has been paid to the vendor, excepting the balance in court, a conveyance is due before the lumber is manufactured, stuck up, and delivered according to the articles. We have shown this to be an erroneous view of the contract. This covenant to make the deed after the lumber was all manufactured, expresses the intent of the parties very clearly; for it was contemplated that the bond would all be absorbed by credits before the contract was finished; the stipulation is, that if the bond is paid off in the manner provided, the vendor should pay in cash $5 per thousand for manufacturing the balance. The entire consideration was to be paid in making lumber. But the plaintiff could collect in money, if not so paid, to the extent of the bond. And hence being payable in manufacturing lumber, it was proper to state this, without reference to the money, as the consideration to be complied with precedent to a conveyance.

To claim that payment of the judgment entered on the bond is a satisfaction in full of the agreement, so as to entitle the vendees to a conveyance, is to assume that the consideration was not an entirety, and that as soon as it fell due they might have paid it and claimed the conveyance. This was not possible, without disregarding the expressed intention of the parties, as already shown.

The collection of the balance of the judgment did not in the least affect the right of the plaintiff to insist on compliance with the agreement. It did not place the defendants in any worse situation, excepting perhaps to the extent of the inconvenience of paying the money, or having it made out of the property at the time. The bond being satisfied, the plaintiff thereafter became liable to pay the whole contract price of manufacturing the lumber, in cash. This is the agreement. The plaintiff gained nothing, and the defendants lost little in the operation—no more than was incident to their agreement, and as a consequence of non-compliance, in a manner that would have saved them from execution. There is nothing in this part of the case that dispenses with performance by the defendants or their assignees, and these covenants being dependent, and the consideration entire, they must be performed or dispensed with.

The issue tried determined nothing about the performance or non-performance of the covenants, excepting so far as it related to the issue itself, which was, whether the judgment was paid or not. The judgment related to only part of the consideration. It did not affect the other covenants in the agreement—no more than would it have affected an additional security, to be paid at a different time or in a different manner. A judgment is conclusive of nothing, by way of inference or argument, but only of such matters as the pleadings show are embraced in it. It therefore

[*Parmentier v. Wheat et al.*]

had no operation on performance in manufacturing lumber, over and above the amount necessary to extinguish the bond. But the court evidently considered the money portion as the entire consideration for the bond. This is not to be wondered at, considering the peculiarity of the transaction; but it was nevertheless an error.

It was claimed in argument, that the plaintiff had notified the tenants in possession that she would take no more lumber. Taking this for true, we do not decide what the effect of it may be in other issues between the parties; but if this, together with the fact that the judgment was paid, led the court to make the order in the case, on the ground of refusal by the plaintiff to comply with her covenants, it was error, for on that point she had a right to be heard before a jury; and the issue before the court did not involve the question further than the judgment was concerned, and, as to this, the jury found against a refusal on her part to comply. We think there was not such a case, in the aspect in which it was presented here, as called for the equitable interference of the court to suspend the payment of the money until the deed was made, and the order to that effect must be reversed.

> Now, to wit, May 4th 1859, the order of the Court of Common Pleas of Tioga county, of the 11th December 1858, making the rule absolute of June 15th 1859, to show cause why the money in this case shall not remain in court until a deed is made by the plaintiff to the defendants, is reversed.